## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARCOS F. SANTIAGO** | : | |
| | : | |
| **Plaintiff** | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **NO. 05-CV-4884** |
| | : | |
| **LIEUTENANT KEITH FIELDS,** | : | |
| **et al.** | : | |
| **Defendants** | : | |

## MEMORANDUM OPINION & ORDER

**GOLDEN, J.**                                                    **MARCH 12, 2009**

This Bivens[1] civil action was brought by Plaintiff Marcos F. Santiago against federal

correction officials Lieutenant Keith Fields ("Lt. Fields"), and Officers Keith Hampton, Patrick

Henderson, and C. Hemmings (collectively, "Defendant Officers") for violations of Plaintiff's

Eighth Amendment rights.[2]  Plaintiff alleges that on March 28, 2005, while he was incarcerated

at the Federal Detention Center in Philadelphia, Lt. Fields punched, stomped, and choked

Plaintiff while Plaintiff was on the floor of his cell and shackled with arm and leg restraints.

(First Am. Compl. ¶ 1).  Plaintiff further alleges that Officers Hampton, Henderson, and

Hemmings held Plaintiff down during Lt. Fields' attack and failed to intervene on Plaintiff's

behalf.  (Id.).  Defendants have moved for summary judgment on the following grounds: (1)

---

[1] In Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971), the U.S. Supreme Court recognized a private cause of action to recover damages against a federal agent for violations of constitutional rights.

[2] Officer S. Morello was initially named as a Defendant in this action.  Officer Morello was terminated as a Defendant on June 5, 2008. (Doc. No. 62).

Defendants did not engage in an Eighth Amendment violation, and (2) even if there was an

Eighth Amendment violation, Defendants are immune from suit under the doctrine of qualified

immunity because Plaintiff's clearly established constitutional rights were not infringed upon.

(Defs.' Br. at 2, 10-11, 13).  After careful consideration of the briefs submitted by the parties, and

the exhibits appended thereto, the Court denies Defendants' Motion for Summary Judgment.

(Doc. No. 67).

<b>RELEVANT FACTS</b>

**A.    Background**

Plaintiff was incarcerated at the Federal Detention Center ("FDC") in Philadelphia from

January 17, 2003 through June 20, 2005, having initially been detained there for pre-trial

purposes and later to await a more permanent prison placement.  (Defs.' Stmt. of Facts ¶ 14).  In

January 2005, Plaintiff was placed in the FDC's Special Housing Unit ("SHU") for 90 days for

allegedly filling a bucket with hot water and using the bucket to threaten inmates and FDC staff.

(Id. ¶¶ 46-47).  The SHU is the most secure part of the FDC and contains cells designed for

inmates on administrative detention or disciplinary segregation.  (Id. ¶ 17).

On March 27, 2005, Plaintiff, while in the SHU, threw a cup of bodily excretions on

Officer Angel Hidalgo while Officer Hidalgo was opening the food slot in Plaintiff's cell door to

retrieve Plaintiff's food tray.  (Id. ¶ 50).  As a result of this incident, the FDC Captain directed

FDC staff to place Plaintiff in arm and leg restraints.  (Id. ¶ 52).  The FDC Captain informed

Plaintiff that, because of his conduct, Plaintiff was no longer on disciplinary segregation, but was

instead in administrative detention, which meant that Plaintiff had to stay in the SHU until he

was transferred to another Federal Bureau of Prisons ("BOP") institution.  (Id. ¶ 55).

2

At 2:00 p.m. on March 28, 2005, Lieutenant Conrada Dionne Elliot conducted a restraint check in Plaintiff's cell, at which time she noticed that the restraints appeared to be having a calming effect on Plaintiff.  (Id. ¶ 58; Santiago Decl. ¶ 2).  Under BOP policies, a restraint check of inmates in restraints must be conducted "by a Lieutenant every two hours to determine if the use of restraints has had the required calming effect and so that the inmate may be released from those restraints . . . as soon as possible."  28 C.F.R. § 552.24(e); (Defs.' Stmt. of Facts ¶ 22).  Because Plaintiff was calm and cooperative, Lt. Elliot removed the leg restraints, but Plaintiff remained in the arm restraints.  (Defs.' Stmt. of Facts ¶ 58; Santiago Decl. ¶¶ 3-4).

Lt. Fields took over for Lt. Elliot as the on-duty operations lieutenant and officer responsible for conducting two-hour restraint checks.  (Defs.' Stmt. of Facts ¶ 59).  At 6:00 p.m., Lt. Fields entered Plaintiff's cell with the other Defendant Officers to conduct a two-hour restraint check.  (Id. ¶ 63).  Lt. Fields reaffixed the leg irons on Plaintiff, which made Plaintiff very upset.  (Santiago Decl. ¶¶ 10-11, 13).  Lt. Fields instructed Plaintiff to move towards the wall while Defendant Officers searched his cell.  Plaintiff complied.  (Id. ¶¶ 12-13).  Plaintiff was then pat-searched as Officers Henderson and Hemmings held Plaintiff's upper arms.  (Defs.' Stmt. of Facts ¶ 64; Lt. Fields Dep. at 224; Santiago Decl. ¶ 14).  During the search of Plaintiff, Lt. Fields instructed Plaintiff to open his mouth so Lt. Fields could check for contraband.  (Santiago Decl. ¶ 15).  Plaintiff refused.  Lt. Fields again asked Plaintiff to open his mouth.  Plaintiff again refused.  (Id. ¶ 16).  According to Plaintiff, Lt. Fields then yelled: "Open up your mouth or I'm going to make you eat the ground."  (Id. ¶ 17).  The parties have presented dramatically different sets of facts as to what occurred next.

3

**B.      Plaintiff's Version of Events**

Plaintiff claims that he began lowering himself to the ground "to keep [Lt. Fields] from taking [Plaintiff] down," at which time Lt. Fields grabbed Plaintiff's leg restraints, yanked them, and swept Plaintiff off his feet.[3]  (Defs.' Ex. K ¶ 5; Santiago Decl. ¶ 17).  Officers Henderson and Hemmings broke Plaintiff's fall and lowered Plaintiff to the ground.  (Santiago Decl. ¶ 18).  Lt. Fields then twice asked Plaintiff to open his mouth, and Plaintiff refused both requests.  (Id. ¶ 19).  Lt. Fields dragged Plaintiff across the floor by his leg restraints, while Lt. Fields yelled at Plaintiff to open his mouth.  (Id. ¶¶ 19-20).  Plaintiff refused, at which time Lt. Fields dropped Plaintiff's legs and stood over Plaintiff with his right hand stretched out.  (Id. ¶ 20).  Lt. Fields, for at least the sixth time, asked Plaintiff to open his mouth, and Plaintiff again refused.  (Id.).  Though Plaintiff claimed in his affidavit, which was signed the day after the incident, that he did not "know why [he] refused" because he "didn't have anything" in his mouth, he now asserts (in a declaration filed in support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment) that he repeatedly refused because he was upset that Lt. Fields reaffixed his leg restraints despite his good behavior.  (Defs.' Ex. K ¶ 4; Santiago Decl. ¶ 16).[4]

---

[3] Plaintiff, however, alleged in his sworn affidavit, which he signed the day after the incident, that Lt. Fields "*tried* to take [him] down by pulling [his] leg restraints."  (Defs.' Ex. K ¶ 5) (emphasis added).

[4] On August 8, 2008, Plaintiff's counsel submitted an unsigned declaration by Plaintiff in response to Defendants' Motion for Summary Judgment.  This declaration was ultimately signed by Plaintiff on August 22, 2008 and refiled on August 28, 2008.  (Doc. No. 78).  Defendants claim that Plaintiff's declaration is a "sham" because it adds additional facts not in the record and contradicts Plaintiff's earlier affidavit signed the day after the incident. (Defs.' Sur-reply Br. at 4-8).  Thus, Defendants assert, the declaration "is nothing but an improper effort to create factual disputes."  (Id. at 7).

"[A] party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict."  Baer v. Chase, 392 F.3d 609, 623-24 (3d Cir. 2004) (articulating the "sham affidavit" doctrine).  Defendants neither took the deposition of Plaintiff nor sought pretrial discovery.  (Pl.'s Opp. Br. at 2 n.2, 4).  To the extent that this "sham affidavit" doctrine applies where there is no prior deposition testimony, any contradictions that do exist between the initial affidavit and Plaintiff's subsequent declaration do not affect the dispositive dispute between the parties as to

Lt. Fields exited the cell and threw Plaintiff's dinner into the hallway out of frustration. (Santiago Decl. ¶ 21). Plaintiff admits that he spat on and cursed at Lt. Fields when Lt. Fields reentered the cell. (Id. ¶¶ 24, 34; Pl.'s Resp. to Defs.' Stmt. of Undisputed Facts ¶¶ 66, 90). The saliva landed on Lt. Fields' chest. (Defs.' Ex. K ¶ 7). Plaintiff claims that Lt. Fields, in retaliation for the spitting, approached Plaintiff, who was on the ground, and stomped his face and kicked him in the back of the head. (Santiago Decl. ¶ 25; Pl.'s Resp. to Defs.' Stmt. of Undisputed Facts ¶ 66; First Am. Compl. ¶ 15). Officers Hampton, Hemmings, and Henderson then held Plaintiff's body to the floor while Plaintiff was fully shackled. (Santiago Decl. ¶ 26; First Am. Compl. ¶ 16). Lt. Fields sat on Plaintiff's back and punched Plaintiff twice: once in the right side of his face near his right eye, and then in his face where the side of his face meets the back of his head. (Santiago Decl. ¶ 26; First Am. Compl. ¶ 15). Lt. Fields then choked Plaintiff while yelling, "You're never going to spit on me again. Say you're never going to spit on me again! Say you're not going to spit on me again!" (Santiago Decl. ¶¶ 27-28). Plaintiff stated, "Alright, you got that . . . you got that. Alright, you got that," at which time the attack stopped and Defendants left. (Id. ¶¶ 29-30). The attack probably lasted a couple of minutes. (Pl.'s Resp. to Defs.' Stmt. of Undisputed Facts ¶ 66). After the attack, Lt. Fields did not look inside Plaintiff's mouth. (Id. ¶ 70).

**C.      Defendants' Version of Events**

Defendants set forth a different version of events. Defendants claim that Plaintiff, on his own, dropped to the floor while Defendants tried to break his fall. Plaintiff then started kicking

the amount of force used by Lt. Fields. If contradictions exist, they may be used for impeachment at trial.

and flailing his arms and legs.  (Defs.' Stmt. of Facts ¶ 65; Lt. Fields Dep. at 225).[5]  Lt. Fields

told the other Defendant Officers to hold Plaintiff's arms and legs down, after which Lt. Fields

stood over Plaintiff and told him to open his mouth so Lt. Fields could complete the search for

contraband.  (Defs.' Stmt. of Facts ¶ 65; Lt. Fields Dep. at 225).  While on the ground, Plaintiff

yelled curses at Lt. Fields and spat on him, with Plaintiff's saliva landing on Lt. Fields' pant leg.

(Defs.' Stmt. of Facts ¶ 66; Lt. Fields Dep. at 226, 232, 244-46, 249).  Lt. Fields interpreted

Plaintiff's spitting as an assault requiring force necessary to gain control of Plaintiff.  (Defs.'

Stmt. of Facts ¶ 69; Lt. Fields Dep. at 323-24, 326-27; see also 28 C.F.R. § 552.20 (stating that a

correction official is authorized to apply physical restraints necessary to gain control of an inmate

after the inmate assaults another individual).  Lt. Fields turned Plaintiff's head away and told

Plaintiff to stop spitting.  (Defs.' Stmt. of Facts ¶ 66; Lt. Fields Dep. at 226).  In turning

Plaintiff's head away, Lt. Fields held one opened hand on the side of Plaintiff's face and used the

other hand to support the back of Plaintiff's head at the neck so Plaintiff could not turn his head

back toward Defendants and spit on them.  (Defs.' Stmt. of Facts ¶ 67; Lt. Fields Dep. at 246,

275, 277).  Plaintiff then opened his mouth, and Lt. Fields checked for contraband.  After the

search, Defendants exited the cell.  (Defs.' Stmt. of Facts ¶ 70; Lt. Fields Dep. at 226-27, 248-

49).

**D.      After the Incident**

After the incident, Kenneth C. Kaiser ("Kaiser"), a physician's assistant at the FDC,

documented Plaintiff's physical condition.  (Defs.' Stmt. of Facts ¶ 92).  In Kaiser's report, he

_____

[5] Plaintiff claims that if he flailed, it was because of Lt. Fields' dragging of Plaintiff's body by his leg restraints.  (Pl.'s Resp. to Defs.' Stmt. of Undisputed Facts ¶ 65).

noted a "small amount" of edema (swelling) around Plaintiff's temporal region and erythema

(redness) on the right side of his neck.  (Id. ¶ 93; Defs.' Ex. M).  His ultimate diagnosis was

"mild edema" and "contusion."  (Defs.' Ex. M).  Kaiser also noted that Plaintiff was alert,

oriented, and not in distress.  (Defs.' Stmt. of Facts ¶ 93; Defs.' Ex. M).  Photographs taken of

Plaintiff the day after the incident on March 29, 2005 show bruising to Plaintiff's right eye and

the right side of his neck.  (Defs.' Stmt. of Facts ¶ 94; Pl.'s Ex. B to Santiago Decl.).  At his

deposition, Kaiser stated that he would not characterize the bruising depicted in the March 29

photographs as "mild."  (Kaiser Dep. at 66-67).  Kaiser further testified that bruising, edema, and

redness could occur when a person is kicked and choked.  (Id. at 34-35).  Plaintiff was also

examined twice on March 30, with each examiner noting Plaintiff's injuries.  (Pl.'s Resp. to

Defs.' Stmt. of Undisputed Facts ¶ 94; Pl.'s Ex. 11; Pl.'s Ex. 13).[6]

## STANDARD

Summary judgment should be granted if the record, including pleadings, depositions,

affidavits, and answers to interrogatories, demonstrates "that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56(c).  In making that determination, the "evidence of the non-movant is to be believed, and

all justifiable inferences are to be drawn in his favor."  Anderson v. Liberty Lobby, Inc., 477 U.S.

---

[6] Special Investigative Agent Jeffrey Edwin McLaughlin conducted an internal investigation after the alleged assault and concluded that Defendants had acted in accordance with the BOP's use of force policy.  (Defs.' Stmt. of Facts ¶ 100; McLaughlin Dep. at 93; Defs.' Ex. P).  Agent McLaughlin determined, among other things, that Plaintiff's claim of excessive force was the product of his anger toward Lt. Fields about being placed back in leg restraints.  (Defs.' Stmt. of Facts ¶ 100; McLaughlin Dep. at 95-96).  Agent McLaughlin further concluded that Plaintiff's injuries were not consistent with an assault comprising of kicks and punches.  He determined that, if Plaintiff's story is true, the injuries would have been more severe.  (Defs.' Stmt. of Facts ¶ 101; McLaughlin Dep. at 112-13).  Plaintiff claims that Agent McLaughlin's investigation was "shoddy" and incomplete.  (Pl.'s Resp. to Defs.' Stmt. of Undisputed Facts ¶¶ 99, 100).

242, 255 (1986).  The question is whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52.  It is not the role of the trial judge "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."  Id. at 250. Indeed, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  Id. at 255.  "At the summary judgment stage, in other words, 'all that is required [for a non-moving party to survive the motion] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve [at trial] the parties' differing versions of the truth."  Jackson v. Univ. of Pittsburgh, 826 F.2d 230, 233 (3d Cir. 1987) (quoting First Nat'l Bank of Ariz. v. Cities Servs. Co., 391 U.S. 253, 288-89 (1968)), cert. denied, 484 U.S. 1020 (1988).

## ANALYSIS

A Bivens action—the federal equivalent of a Section 1983 cause of action—will lie where the defendant has violated the plaintiff's rights under the color of federal law.  Brown v. Philip Morris, 250 F.3d 789, 800 (3d Cir. 2001).  "[C]ourts have generally relied upon the principles developed in the case law applying section 1983 to establish the outer perimeters of a Bivens claim against federal officials."  Schrob v. Catterson, 948 F.2d 1402, 1408-09 (3d Cir. 1991); see also Banks v. One or More Unknown Confidential Informants of Fed. Prison Camp Canaan, No. 06-1127, 2008 WL 2563355, at *7 (M.D. Pa. June 24, 2008).  In the instant case, Plaintiff's Bivens claims are premised upon violations of the Eighth Amendment.  Defendants, however, contend that there was no Eighth Amendment violation and, even if there was, Defendants are immune from suit under the doctrine of qualified immunity because Plaintiff's

clearly established constitutional rights were not violated.  (Defs.' Br. at 2, 10-11, 13).

## A.   Eighth Amendment

The Eighth Amendment guarantees that individuals will not be subjected to "cruel and unusual punishment."  U.S. Const. amend. VIII.[7]  Following conviction, the Eighth Amendment "serves as the primary source of substantive protection in cases where an inmate challenges a prison official's use of force as excessive and unjustified."  Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000).  In an Eighth Amendment case, the central question is whether the force used "was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  Whitley v. Albers, 475 U.S. 312, 320-21 (1986); see also Hudson v. McMillian, 503 U.S. 1, 6-7 (1992).  A court should not grant summary judgment to a defendant if "it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain."  Brooks, 204 F.3d at 106 (quoting Whitley, 475 U.S. at 322).  Additionally, liability may exist for a failure to intervene if the defendants "had knowledge of and acquiesced in" a constitutional violation.  Baker v. Monroe Twp., 50 F.3d 1186, 1190-91 (3d Cir. 1995); see also Smith v. Mensinger, 293 F.3d 641, 650 (3d Cir. 2002) (establishing liability where "corrections officer had a reasonable opportunity to intervene and simply refused to do so"); Garbacik v. Janson, 111 F. App'x 91, 94 (3d Cir. 2004).  For there to be a failure to intervene, it follows that "there must exist an underlying constitutional violation."  Harper v. Albert, 400 F.3d 1052, 1064 (7th Cir. 2005); see also Sanders v. City of

---

[7] The standard for analyzing an Eighth Amendment claim contains both subjective and objective components.  Wilson v. Seiter, 501 U.S. 294, 298 (1991).  The subjective inquiry asks whether the defendant acted with a sufficiently culpable state of mind such that his or her actions could be characterized as "wanton" conduct.  Id.  The objective inquiry addresses whether the matters complained of are "sufficiently serious" or "harmful enough" to establish a constitutional violation.  Id.; see also Hudson v. McMillian, 503 U.S. 1, 8 (1992).  This objective component is contextual and responsive to "contemporary standards of decency."  Hudson, 503 U.S. at 8.

Union Springs, 207 F. App'x 960, 965-66 (11th Cir. 2006).

In determining whether a correction officer has used excessive force in violation of the Eighth Amendment, courts look to several factors, including: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response.  Whitley, 475 U.S. at 321; see also Brooks, 204 F.3d at 106.

As a preliminary matter, Defendants seek summary judgment by presenting their own version of the facts and claiming that, based of these facts, no reasonable jury could find for Plaintiff.  In particular, Defendants state the following: "Defendants do not for purposes of their summary judgment motion address plaintiff's conclusory allegations that some defendants punched, stomped, kicked and choked him.  Under the Whitley standard, courts must consider the 'extent of injury' established in the record, not plaintiff's characterizations thereof."  (Defs.' Br. at 13 n.3).  This is a proposition that not only overlooks Whitley's command that a court must examine "the amount of force that was used," but is contrary to the Court's duty to construe all facts in favor of the non-moving party at the summary judgment stage.  Indeed, where there are no non-participant witnesses to the alleged excessive force, as is the case here, the plaintiff's version of events is particularly important and cannot be dismissed as "conclusory."[8]  See Smith,

---

[8] Defendants may be asking the Court to dismiss Plaintiff's claims as "conclusory" in light of Plaintiff's criminal history and alleged pattern of misbehavior at the FDC.  While a jury may be persuaded by Defendants' argument, such credibility determinations cannot be made by a court at the summary judgment stage.  See Anderson, 477 U.S. at 255.

293 F.3d at 650 (accepting plaintiff's version of facts as true at summary judgment stage in

Eighth Amendment case); Barndt v. Pucci, No. 05-2666, 2008 WL 618776, at *5 (M.D. Pa. Mar.

3, 2008) (same).  Plaintiff accurately points out that this is not a case where Defendants have

presented incontrovertible proof that their version of the facts is the correct version.  (Pl.'s Opp.

Br. at 8).  While Defendants may be correct that, when construing all disputed facts in favor of

Defendants, no reasonable jury could find for Plaintiff, such a construction is inappropriate

where Defendants are moving for summary judgment.  Accordingly, the Court will, construing

the facts *in favor of Plaintiff*, determine whether Plaintiff's rights were violated under the Eighth

Amendment.

Applying the Whitley factors while drawing all reasonable inferences in favor of Plaintiff,

a reasonable jury could find that Defendants engaged in excessive force.  Under the first factor

examining the "need for the application of force," there was certainly a need for the application

of force, though the force required was modest.  Plaintiff refused to comply with Lt. Fields'

request to open his mouth on no less than six occasions, and it is not disputed that Plaintiff spat

on Lt. Fields.  Such conduct on the part of Plaintiff clearly necessitated some use of force to

maintain order, ensure that Plaintiff did not have a razor blade or other contraband in his mouth,

and protect Defendants from an additional spitting attack.  The force needed to ensure

compliance, however, was not substantial, given that Plaintiff was on the ground and in arm and

leg restraints at the time of the confrontation.  Lt. Fields, himself, acknowledged that he "didn't

perceive any threat," given that he had convinced Plaintiff in the past to comply with his orders.

(Lt. Fields Dep. at 327).  Moreover, Plaintiff was outnumbered by four correction officers, was in

his cell, and did not attempt to strike or hit Defendants.  Cf. Phillips v. Cain, No. 06-974, 2008

11

WL 2037281, at *4 (M.D. La. May 9, 2008) (summary judgment granted where plaintiff inmate was outside his cell, struck defendant correction officer in the chest, and ran away prior to defendants' use of force).

Under the second factor, which requires a court to examine "the relationship between the need and the amount of the force that was used," Plaintiff has presented evidence that he was stomped, kicked, choked, and punched in the face by Lt. Fields while the other Defendant Officers failed to act.  Lt. Fields admitted during his deposition that, according to his training, it is never appropriate to punch, choke, or kick an inmate.  (Lt. Fields Dep. at 69).  Defendants understandably stress Plaintiff's spitting assault on Lt. Fields as a basis for this Court to grant Defendants' Motion for Summary Judgment.  (Defs.' Sur-reply Br. at 10-12).  Nonetheless, the mere fact that Plaintiff spat on Lt. Fields, though significant, is not dispositive.  All assaults do not pose an equal amount of danger.  Of course, a minor assault would pose a minor danger and would necessitate a proportionate use of force, whereas a major assault would create a greater danger and require a more significant corrective response.

Here, construing the facts in favor of Plaintiff, the spitting assault did not pose a danger to Defendants that would require Lt. Fields to punch, kick, or choke Plaintiff.  Indeed, the force alleged was neither designed to prevent further spitting assaults nor conducted to secure compliance with Defendants' orders.  Thus, given both the violent nature of the alleged assault and the fact that Plaintiff was restrained, a jury could conclude that this use of force was not necessary to either compel Plaintiff to open his mouth or prevent Plaintiff from further spitting at Defendants.  Compare McDougald v. Kennett, No. 06-623, 2008 WL 4378073, at *9 (D. Nev. Aug. 12, 2008) (magistrate judge recommending that summary judgment be denied where

12

defendant correction officer allegedly banged plaintiff inmate's head onto the concrete infirmary floor three times while plaintiff's hands were handcuffed, causing significant injuries, after plaintiff spat in the direction of another correction officer; recommendation approved and adopted by District Court on September 23, 2008), with Hoskins v. Doles, 902 F.2d 33, 1990 WL 51411, at *2 (6th Cir. 1990) (per curiam) (unpublished table decision) (affirming grant of summary judgment where plaintiff inmate spat on correction officers in at least two instances, and defendant sprayed plaintiff with mace after each instance); see also Smith, 293 F.3d at 649 (stating that "[p]unching and kicking someone who is handcuffed behind his back and under the control of at least six prison guards as he is being thrown into cabinets and walls is 'repugnant to the conscience of mankind,' absent the extraordinary circumstances necessary to justify that kind of force"); Davis v. Berks County, No. 04-1795, 2007 WL 516128, at *5 (E.D. Pa. Feb. 8, 2007) (holding that, under the second Whitley factor, choking, kicking, and punching were not necessary to enforce prison rules).[9]

As to the third factor addressing the "extent of injury inflicted," the extent of Plaintiff's injuries could assist a reasonable jury in concluding that Plaintiff's Eighth Amendment rights were violated.  Photographs taken of Plaintiff the day after the incident show bruising to Plaintiff's right eye and the right side of his neck.  (Pl.'s Ex. B to Santiago Decl.).  At his

---

[9] In support of their Motion, Defendants cite Reyes v. Chinnici, 54 F. App'x 44 (3d Cir. 2002), and Smith v. Hulick, No. 97-801, 1998 WL 84019 (E.D. Pa. Feb. 25, 1998), aff'd, 208 F.3d 206 (3d Cir. 2000).  (Defs.' Br. at 19-20).  In Reyes, the defendant correction officer punched the plaintiff inmate once in the shoulder to avoid being spit upon.  The Third Circuit affirmed the District Court's granting of summary judgment in favor of the defendant, holding that the defendant's use of force was "so minor that a court [could] safely assume that no reasonable person could conclude that [the] corrections officer acted maliciously and sadistically."  Reyes, 54 F. App'x at 48-49.  In Smith, the District Court similarly granted summary judgment for the defendant correction officer where the defendant punched the plaintiff, who was not in restraints, once in the face and tackled the plaintiff after the plaintiff disobeyed orders.  Smith, 1998 WL 84019, at *4 (holding that the force used was de minimis).  Reyes and Smith are distinguishable, as the amount of force alleged in the case at bar is far greater than a single strike.

deposition, Kenneth C. Kaiser, who evaluated Plaintiff's injuries, stated that he would not characterize the bruising depicted in the March 29 pictures as "mild." (Kaiser Dep. at 66-67). The Third Circuit, however, has recognized that "the Eighth Amendment analysis must be driven by the extent of the force and the circumstances in which it is applied; not by the resulting injuries." Smith, 293 F.3d at 648. While "the Eighth Amendment does not protect an inmate against an objectively *de minimis* use of force," prison officials who "maliciously and sadistically use force against an inmate violate contemporary standards of decency even if the resulting injuries are not significant" Id. at 647-48. Thus, "*de minimis* injuries do not necessarily establish *de minimis* force." Id. at 649. "[T]he *relatively* minor nature of an injury alone is not grounds for summary judgment. Rather, it is only one feature to be considered by the fact-finder in evaluating the allegations." Wesley v. Hollis, No. 03-3130, 2007 WL 1655483, at *9 (E.D. Pa. June 6, 2007) (internal footnote omitted); see also Smith, 293 F.3d at 649.

In examining this factor, there is a dispute between the parties as to the level of force used by Lt. Fields against Plaintiff. This dispute is material because, while there exists a point where the force used is so minor that no reasonable jury could conclude that malicious and sadistic force was used, the force used by Lt. Fields (when accepting Plaintiff's allegations as true) does not qualify as *de minimis*. See Brooks, 204 F.3d at 107 (holding that, even if minor injuries were inflicted, a claim of excessive force exists where the force was maliciously applied). The force alleged was particularly violent relative to the danger posed by Plaintiff. Where the defendants' actions are disputed, as they are here, "the Court cannot determine that the use of force was objectively *de minimis*." Wesley, 2007 WL 1655483, at *9; see also Smith, 293 F.3d at 649-50 (concluding that there was a jury issue on the need for the application of force).

14

In consideration of the fourth factor requiring an analysis of the "extent of the threat to the safety of staff and inmates," when taking into account the fact that Plaintiff was on the ground, in arm and leg restraints, surrounded by four correction officers, and made no effort to strike or kick Lt. Fields or the other Defendant Officers, the extent of the threat to the staff and other inmates was not substantial, even when taking into consideration Plaintiff's spitting conduct and refusal to comply with Lt. Fields' orders.  See Davis, 2007 WL 516128, at *5 ("Even though [plaintiff] bit [defendant correction officer], [plaintiff] was handcuffed throughout the incident, successfully placed back in his cell where he could have been locked down, and under the control of multiple guards.  Therefore, the extent of the threat to the staff and other inmates could not have been high . . . ."); see also McDougald v. Kennett, No. 06-623, 2008 WL 4378073, at *8-10 (D. Nev. Aug. 12, 2008).  Finally, under the fifth factor, a court must consider any efforts made to temper the severity of a forceful response.  According to Plaintiff's version of events, while Lt. Fields repeatedly asked Plaintiff to open his mouth, no additional efforts were made other than force.

Accordingly, viewing the Whitley factors in conjunction with Plaintiff's allegations, Plaintiff has established that there is a genuine issue of material fact as to whether Lt. Fields' application of force was applied in an attempt to restore discipline, or maliciously and sadistically to cause Plaintiff harm.  See Bafford v. Nelson, 241 F. Supp. 2d 1192, 1202 (D. Kan. 2002) (denying summary judgment where plaintiff inmate was in leg restraints in the shower room and allegedly punched by defendant correction officer several times in the back of the head, causing swelling); Ammouri v. Adappt House, Inc., No. 05-3867, 2008 WL 2405762, at *7 (E.D. Pa. June 12, 2008) (denying summary judgment in Eighth Amendment excessive force case

where defendants' actions were contested and the court was unable to determine how much force was used); Jenkins v. Williams, No. 02-331, 2008 WL 1987268, at *8 (D. Del. May 7, 2008) (denying summary judgment as to state defendants where factual disputes existed); Barndt, 2008 WL 618776, at *5 (refusing, where disputed facts existed as to the need for the application of force, to engage in a credibility analysis to resolve the dispute); Wesley, 2007 WL 1655483, at *10 (denying summary judgment where, according to the Court, "[w]ith so many facts in dispute, it is difficult to answer the very basic and material question of 'what happened'").  Thus, there is also a genuine issue of material fact as to whether the remaining Defendant Officers failed to intervene by "having knowledge of and acquiescing in" a violation of Plaintiff's Eighth Amendment rights.  See Smith, 293 F.3d at 652 (reversing grant of summary judgment in favor of defendant correction officer where a "fact finder could conclude that [defendant] knew that his fellow officers were using excessive force against [plaintiff], had an opportunity to intervene, but refused to do so").

## B.     Qualified Immunity

The doctrine of qualified immunity protects government officials from liability unless their conduct violates clearly established constitutional rights.  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  More specifically, an officer performing his discretionary functions is "shielded from liability for civil damages insofar as [his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Curley v. Klem, 298 F.3d 271, 277 (3d Cir. 2002).  This doctrine provides not only a defense to liability, but immunity from suit.  Hunter v. Bryant, 502 U.S. 224, 227 (1991).  "[I]n reviewing a motion for summary judgment on the basis of qualified immunity, normal principles of summary

16

judgment still apply, and any disputes of fact must be resolved in favor of the plaintiff."  Estate of Smith v. Marasco, 430 F.3d 140, 148 n.3 (3d Cir. 2005).

The U.S. Supreme Court has crafted a two-part test for determining whether a government official is entitled to qualified immunity.  Saucier v. Katz, 533 U.S. 194, 200-01 (2001), overruled in part by Pearson v. Callahan, 129 S. Ct. 808, 812 (2009) ("We now hold that the Saucier procedure should not be regarded as an inflexible requirement . . . . Our decision does not prevent the lower courts from following the Saucier procedure; it simply recognizes that those courts should have the discretion to decide whether that procedure is worthwhile in particular cases.").[10]  First, a court determines whether the facts alleged, viewed in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right.  Id. at 201; Curley, 298 F.3d at 277.  If the plaintiff fails to allege a violation of a constitutional right, no further inquiry is necessary.  Second, if the alleged facts show that there was a constitutional violation, then the Court will assess whether the constitutional right was "clearly established."  Saucier, 533 U.S. at 201.  "Clearly established" means "some but not precise factual correspondence between relevant precedents and the conduct at issue," although "officials need not predict the future course of constitutional law."  McLaughlin v. Watson, 271 F.3d 566, 571 (3d Cir. 2001) (internal quotations omitted), cert. denied, 535 U.S. 989 (2002).  The "salient question" is whether the law at the time of the incident gives the defendant "fair warning" that his conduct was unconstitutional.  Hope v. Pelzer, 536 U.S. 730, 739-40 (2002).  Put another way, a court must determine whether, in the factual scenario established by the

---

[10] Though the U.S. Supreme Court recently added some flexibility to the Saucier analysis in Pearson v. Callahan, 129 S. Ct. 808, 812 (2009), this Court concludes that Saucier's two-step framework is worthwhile in this particular case.

plaintiff, "a reasonable officer [would] have understood that his actions were prohibited."
Bennett v. Murphy, 274 F.3d 133, 136 (3d Cir. 2002); see also Curley, 298 F.3d at 277.

Granting qualified immunity to Defendants under the facts alleged by Plaintiff is not
appropriate.  The first element of the qualified immunity test is satisfied, as Plaintiff has
presented sufficient facts for a reasonable jury to conclude that Defendants committed an Eighth
Amendment violation.  Thus, the remaining question is whether, under the second element,
Plaintiff's "clearly established" constitutional rights were violated.

The Eighth Amendment's guarantee against cruel and unusual punishment has been part
of the Constitution since 1791.  Since at least 1986—nineteen years before the incident in
question—the clearly established rule in these types of cases has required courts to determine
whether the force used "was applied in a good-faith effort to maintain or restore discipline, or
maliciously and sadistically to cause harm."  See Whitley, 475 U.S. at 320-21.  If Plaintiff's
version of the facts is true, no reasonable officer in Lt. Fields' position could have believed that,
where an inmate's arms and legs are shackled, it is lawful to stomp, kick, punch, and choke the
inmate in response to both the inmate's failure to open his mouth and his spitting on an officer.
This is consistent with Lt. Fields' deposition testimony that, according to his training, it is never
appropriate to punch, choke, or kick an inmate.  (Lt. Fields Dep. at 69); see Bafford, 241 F. Supp.
2d at 1205 (rejecting summary judgment on qualified immunity ground where plaintiff inmate,
while in leg restraints in the shower room, was punched several times in the back of the head by
defendant correction officer); McDougald, 2008 WL 4378073, at *9 (rejecting summary
judgment on qualified immunity ground where handcuffed plaintiff inmate spat at defendant
correction officer and defendant allegedly banged plaintiff's head into the concrete floor three

times); Detty v. MacIntyier, No. 07-623, 2007 WL 4179854, at *3 (E.D. Pa. Nov. 27, 2007)

(holding, at motion to dismiss stage, that "it would not be unreasonable to conclude that

[defendant correction officer] should have known that severely beating a handcuffed prisoner

would violate the well-established right against excessive use of force"); Wesley, 2007 WL

1655483, at *13 (rejecting summary judgment on qualified immunity ground where plaintiff

inmate was securely locked alone in his cell, and defendant correction officer caused plaintiff's

handcuffs to be tightened painfully and slammed plaintiff into the cell door). It follows that,

based on the standard articulated in 2002 by the Third Circuit in Smith v. Mensinger, 293 F.3d

641 (3d Cir. 2002), no reasonable officer in the position of the other Defendant Officers could

have believed that it was lawful to allow Lt. Fields' conduct to continue. See id. at 650

(establishing liability where "corrections officer had a reasonable opportunity to intervene and

simply refused to do so"); see also Klaitz v. New Jersey, No. 04-529, 2008 WL 111277, at *7

(D.N.J. Jan. 8, 2008) (rejecting summary judgment on qualified immunity ground where a

reasonable person in defendant correction officer's position would have found that the alleged

abuse inflicted on plaintiff inmate was improper such that defendant "would know that she was

legally required to intervene").

Additionally, Plaintiff properly contends that there are sufficient material disputed facts

that would render summary judgment on qualified immunity inappropriate. (Pl.'s Opp. Br. at

15). Central to Defendants' argument is their contention that, contrary to Plaintiff's assertions,

Lt. Fields did not punch, stomp, or choke Plaintiff, but rather restrained Plaintiff to prevent an

assault on Lt. Fields and the other Defendant Officers. (Defs.' Stmt. of Undisputed Facts at ¶¶

66-70). While qualified immunity questions should generally be resolved at the earliest possible

stages of litigation, the Third Circuit has cautioned that, "[j]ust as the granting of summary

judgment is inappropriate when a genuine issue exists as to any material fact, a decision on

qualified immunity will be premature when there are unresolved disputes of historical fact

relevant to the immunity analysis." Curley, 298 F.3d at 278 (reversing District Court's decision

that defendant officer was entitled to qualified immunity under the Fourth Amendment).[11]  As a

result, it is improper to grant qualified immunity to Defendants because significant factual

disputes remain regarding the extent of the force used by Lt. Fields on Plaintiff and,

consequently, whether the other Defendant Officers had a duty to intervene to protect Plaintiff's

clearly established constitutional rights.  See Nieves v. Ortiz, No. 06-5206, 2007 WL 1791256, at

*11 (D.N.J. June 19, 2007) (denying summary judgment on qualified immunity ground in

Section 1983 case where plaintiff alleged various constitutional violations because unresolved

factual disputes existed); Wesley, 2007 WL 1655483, at *13 (denying summary judgment on

qualified immunity ground where "the evidence in the record at least minimally suffices to raise a

genuine issue of fact as to the nature and purpose of the actions taken by" defendant correction

officer and of other defendant's failure to intervene in a timely manner); Davis, 2007 WL

516128, at *9-10 (denying summary judgment on basis of qualified immunity in Eighth

Amendment excessive force case where disputed facts existed as to whether defendants were

justified in using force to protect themselves).

---

[11] Defendants contend that Curley is inapplicable because Curley arose out of a non-inmate plaintiff's claim that his Fourth Amendment rights were violated.  (Defs.' Sur-reply Br. at 8.)  There is no reason, however, to believe that the qualified immunity principles articulated in Curley are any different in the context of the Eighth Amendment. See Davis, 2007 WL 516128, at *9-10 (applying Curley principles in Eighth Amendment case).

**CONCLUSION**

Defendants properly note that courts have repeatedly recognized that the demands of maintaining order in a prison are strenuous, especially when, as is the case here, an inmate defies an order by a correction officer.  (Defs.' Br. at 14, 19).  A correction officer is generally given great latitude to use force to compel obedience in an effort to maintain control.  As a result, courts must not second guess correction officials' "split-second judgments" about the necessity of force in "tense, uncertain, and rapidly evolving" circumstances.  Graham v. Connor, 490 U.S. 386, 396-97 (1989).  Correction officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  Whitley, 475 U.S. at 321-22 (quoting Bell v. Wolfish, 441 U.S. 520, 547 (1979)).  This judicial deference does not "insulate from review actions taken in bad faith and for no legitimate purpose"; rather, "it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice."  Id. at 322.

The Court is mindful of the demands placed upon correction officers, especially the requirement to make instantaneous life or death decisions regarding the use of force.  This is particularly the case here where Plaintiff refused to comply with orders and spat on Lt. Fields.  The dispute in this case, however, goes beyond a mere dispute "over the reasonableness of a particular use of force."  See id.  Rather, the central dispute is over the amount of force used and, construing the disputed facts in favor of Plaintiff, a reliable inference of the wantonness in the infliction of pain exists.  Accordingly, this issue must be left to a jury.

An appropriate Order follows.

21

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARCOS F. SANTIAGO** | : | |
| | : | |
| **Plaintiff** | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **NO. 05-CV-4884** |
| | : | |
| **LIEUTENANT KEITH FIELDS,** | : | |
| **et al.** | : | |
| **Defendants** | : | |

**ORDER**

AND NOW, this 12th day of March, 2009, upon consideration of Defendants' Motion for

Summary Judgment, Plaintiff's Brief in Opposition, Defendants' Reply Brief, Plaintiff's Sur-

Reply Brief, and all appended exhibits, it is hereby ORDERED that this Motion (Doc. No. 67) is

DENIED.

BY THE COURT:


*/s/ Thomas M. Golden*
THOMAS M. GOLDEN, J.